UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

Todd Cooper

Defendants.

Hon. Hugh B. Scott

05CR109

**REPORT & RECOMMENDATION**

Before the Court is the defendant's motion seeking suppression of evidence and statements. (Docket No. 5 filed in 05MJ2023).

**Background**

The defendant, Todd W. Cooper ("Cooper"), has been charged by indictment with one count of unlawful possession of a firearm in violation of 18 U.S.C. 922(g)(1) and 924(a)(2). The defendant asserts that the police lacked probable cause to stop and search him at the time he was arrested.

A suppression hearing was held on August 15, 2005. Officer Daniel Horan ("Horan"), of the Buffalo Police Department, testified that on February 18, 2005 he received a call sometime in the late afternoon of a complaint concerning an aggressive panhandler near the Lotus bar in the

vicinity of Elmwood Avenue and Lancaster Street. (R. 5).[1]  The individual was described as "a black male wearing army fatigue coat, an overcoat." (R. 6).  Because the Lotus bar is located near the corner of Delaware and Delevan Avenues, Officer Horan and his partner Officer Christopher Mendola ("Mendola") who were driving in a marked patrol car, first went to the Delaware-Delevan intersection. They did not observe anyone meeting the description they were given at that location. (R. 7). The officers then proceeded toward Elmwood Avenue.  Officer Horan testified that along the way they spotted Officers Tom Ocino and Dino Cordone, and advised them of the call about an aggressive panhandler. (R. 8).  Officers Horan and Mendola continued slowly, going south on Elmwood Avenue.  Officer Horan testified that he noticed a male who fit the description at the corner of Elmwood and Auburn Avenues.  Officer Horan testified that the defendant was wearing a military fatigue coat matching the description he was given in the complaint regarding the aggressive panhandler.[2]   Officer Horan made an in-Court identification of Cooper as being the individual he saw at that time. (R. 10-11, 13). According to Officer Horan, once Cooper observed the patrol car driven by Officers Ocino and Cardone and started to walk "in a direction that he turned and came towards our vehicle" which would have been walking north on Elmwood. (R. 13).  Officer Horan advised his partner that Cooper fit the

---

[1]  References relate to the transcript of the suppression hearing filed as Docket No. 17.

[2]  As discussed below, the defendant asserts that he was not wearing a fatigue-style coat at the time he was arrested.  The Court notes that the arrest took place in the late afternoon/early evening in February in Buffalo.  The hearing record does not reflect whether there was limited sunlight available and whether that may have played a role as to the officer's perception of the coat being worn by the defendant at that time.

description, he opened the car door and got out of the car.[3]  Officer Horan stated that he made eye contact with Cooper and asked him to stop.  According to Horan, Cooper did not stop, but instead "abruptly turned" going back south on Elmwood toward the Wilson Farms at the corner of Elmwood and Auburn Avenues. (R. 14).  As Cooper walked away briskly, Officer Horan yelled at him to stop and to take his hands out of his pockets. (R. 15).  Cooper purportedly "picked up his pace" at that point, and Officer Horan began to run after him.  Cooper reached a mail box at the corner of Elmwood and Auburn just as Officer Horan caught up to him. (R. 16).  According to Officer Horan, Cooper pulled out a clear plastic bag with something dark in it and placed it in the mailbox. (R. 17).  Officer Horan testified that he heard "a loud thud" when the item was placed in the mailbox. (R. 18).  At this point, Officer Mendola had joined Officer Horan, and the two police officers placed Cooper on the ground and restrained him in handcuffs. (R. 18).  Officer Horan originally thought that the bag placed in the mailbox contained drugs.  A postal inspector was called to the scene, the mailbox was opened, and a clear plastic bag with a gun in it was discovered inside the mailbox. (R. 20).  Officer Horan testified that Cooper was read his rights and asked why he put his hand in the mailbox.  Officer Horan testified that "most of his answers at that time I was questioning him was 'I want to see my lawyer.'" (R. 22).  At some point, Cooper allegedly stated that he was mailing mail for his grandmother. (R. 21).  As to whether Cooper made this statement after or before asking for an attorney, Officer Horan stated: "I can't definitely say what I recall at that point because there wasn't – I was asking questions, he was asking for a lawyer, but at some point in that time he did say that he was mailing letters for

---

[3]  On cross-examination, Officer Horan testified that Copper was stopped solely because he fit the description he was given, Officer Horan did not observe Copper acting in an aggressive manner. (R. 26).

his grandmother." (R. 22). [4]

Officer Mendola's testimony is similar to that of Officer Horan.  Officer Mendola corroborates Officer Horan's testimony regarding the call about an aggressive panhandler; that they first went to the corner of Delaware and Delevan in response to the call; that they spoke with Officers Ocino and Cardone; that they spotted Cooper near the corner of Elmwood and Auburn avenues wearing a "green fatigue jacket." ((R.. 47-48, 49).  Officer Mendola testified that Cooper was also wearing a green fatigue hat as well. (R. 49).  Officer Mendola testified that he saw Cooper place a plastic bag inside the mailbox, but did not see what was inside the bag at that time. (R. 50).   According to Officer Mendola, he was the one who read Cooper his rights after placing Cooper in the back seat of the patrol car. (R. 52-53).  According to Officer Mendola, Cooper did not make any statements after being read his rights.  (R. 53).

Cooper also testified at the suppression hearing.[5]  He asserted that he was not wearing a fatigue-style coat at the time he was arrested. (R. 60).  He denied panhandling or possessing a gun at any time on that day. (R. 60).  Cooper claims that he was in the area of Elmwood and Auburn because he had spent the evening of February 17, 2005 with a women acquaintance at a friend's apartment on Delevan Avenue for which he had the keys.  (R. 67-70).  Although Cooper testified that he probably would have had the keys with him when he was arrested, keys to the apartment were not listed on the property receipt and Cooper did not have them any longer. (R.

---

[4]  Separate from the instant federal weapons charge, Cooper was charged in state court with resisting arrest, obstruction of governmental administration, and criminal possession of a weapon. (R. 31, 33).

[5]  The defendant testified that at the time of the hearing he was on parole based upon convictions for criminal possession of a weapon and for criminal sale of a controlled substance. (R. 61).

70). Cooper acknowledges that he saw two police cars on Elmwood Avenue and that an officer told him to stop. (R. 75). He claims that he was forced to stop. (R. 75). Cooper testified that he was stopped by the officers approximately 20 feet from the mailbox. (R. 79). Cooper also stated that two "youths" were standing at the mailbox at that time, and that these youths ran off when the police came. (R. 80)   The defendant argued that he has not been out of custody since he was arrested and that the grey jacket the defendant wore to Court was the jacket he was wearing at the time he was arrested. (R. 33). At the suppression hearing, the defendant presented a copy of a Prisoner's Property Receipt (Exhibit C), as evidence that he was not wearing a fatigue-style coat at the time he was arrested. This document describes the defendant's coat as being "grey." (See Exhibit C). Both Officers Horan and Mendola testified that the coat presented at the suppression hearing did not fit the description of the coat they saw Cooper wearing at the time he was arrested. (R. 28, 54).

An investigative stop must be based upon a reasonable suspicion that criminal activity has occurred or is about to occur. Terry v. Ohio, 392 U.S. 1, (1968) ; United States v. Tehrani, 49 F.3d 54, 58 (2d Cir.1995), and such suspicion must be "supported by articulable facts." United States v. Peterson, 100 F.3d 7, 10 (2d Cir.1996) (citation and internal quotation marks omitted). "[T]he Fourth Amendment requires at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 120 S.Ct. 673, 676 (2000) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989). In assessing an investigative detention, we must consider "the totality of the circumstances" surrounding the stop, Sokolow, 490 U.S. at 8 (internal quotation marks and citation omitted), and we must evaluate those circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." United States v.

Oates, 560 F.2d 45, 61 (2d Cir.1977); United States v. Stone, 225 F.3d 647 (2d Cir. 2000).

Viewed from a totality of the circumstances, reasonable suspicion existed to stop Cooper in connection with the call about the aggressive panhandler. Both Officers Horan and Mendola testified that they saw the defendant wearing a coat that they perceived as fitting the description given to them regarding the panhandler. Officer Horan observed Cooper take what could be construed as evasive action after seeing the patrol car driven by Officers Ocino and Cardone. When Officer Horan stepped from his car and asked Cooper to stop, Cooper took further action when he abruptly turned again and began to briskly walk away, at first, and then to run or jog. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." Wardlow, 528 U.S. at 124 ; See also United States v. Garcia, 339 F.3d 116, 119 (2d. Cir. 2003). Thus, the defendant's Fourth Amendment rights were not violated when he was stopped. Further, the defendant has not articulated any standing to contest the search of the mailbox.

It is recommended that the motion to suppress the evidence obtained as a result of the stop and arrest of Cooper on February 18, 2005 be denied.

Cooper also seeks to suppress a statement he was alleged to have made in response to a question from Officer Horan as to what Cooper placed in the mailbox. In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court held that the government may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that privilege. The burden of proving that such warnings were given is on the government, Colorado v. Connelly, 479 U.S. 157, 168-69 (1986) and a failure to meet that burden requires the suppression of the postarrest statements for use in the government's case in

chief. United States v. Mathurin, 148 F.3d 68, 69 (2d. Cir. 1998).

The government does not contend that Cooper was not in custody at the time the alleged statement was made. Officer Horan testified that he asked Cooper several questions, including what it was he placed in the mailbox, but that Cooper had repeatedly refused to answer the questions and asked for an attorney. At some point during this process, Cooper was alleged to have stated that he placed mail in the box for his grandmother. Cooper denies making this statement. Officer Horan could not state whether Cooper made this alleged statement before or after Cooper had requested that he be allowed to talk to a lawyer. (R. 22). The record does not reflect, and Officer Horan did not testify that he specifically read Cooper his Miranda rights. Indeed, Officer Mendola testified that he read Cooper his rights, and that Cooper did not make any statements to him after his rights were read. (R. 53). The government has not met its burden on this issue. Based on the record before the Court, it cannot be concluded that Cooper was properly advised of his rights, and that he waived those rights, prior to being asked what he placed in the mailbox and allegedly responding that he was mailing items for his grandmother. It is recommended that Cooper's alleged statement that he was mailing something for his grandmother be suppressed.

## Conclusion

Based on the above, it is recommended that the defendant's motion to suppress be GRANTED IN PART AND DENIED IN PART consistent with the above.

Pursuant to 28 USC §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report &

Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as WDNY Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME,  OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.**  Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and WDNY Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 72.3(a)(3)may result in the District Court's refusal to consider the objection.**

So Ordered.

                                                 /s/ *Hugh B. Scott*
                                     United States Magistrate Judge
                                     Western District of New York

Buffalo, New York
December 12, 2005